\IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| ANITA LOUISE BEALE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 3:15-CV-2736-BH |
| | ) | |
| CAROLYN COLVIN, | ) | |
| COMMISSIONER OF THE SOCIAL | ) | |
| SECURITY ADMINISTRATION, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

Pursuant to the consent of the parties and the order of reassignment dated November 9, 2015, this case has been transferred for the conduct of all further proceedings and the entry of judgment. (doc. 18.)  Before the Court are *Plaintiff's Brief on Review of the Social Security Administration's Denial of Benefits*, filed December 3, 2015 (doc. 19), *Defendant's Response Brief in Support of the Commissioner's Decision*, filed January 29, 2016 (doc. 22), and *Plaintiff's Reply to the Commissioner's Brief*, filed February 18, 2016 (doc. 23).  Based on the relevant findings, evidence, and applicable law, the Commissioner's decision is **AFFIRMED.**

## I. BACKGROUND[1]

### A.     Procedural History

Anita Louise Beale (Plaintiff) seeks judicial review of a final decision by the Commissioner of Social Security (Commissioner) denying her claim for disability benefits under Title XVI of the Social Security Act.  (doc. 19 at 4.)  On July 21, 2010, Plaintiff applied for disability benefits, alleging disability beginning on July 23, 2009, due to an inability to work.  (R. at 347-50.)  She

---

[1]   The background information comes from the transcript of the administrative proceedings, which is designated as "R."

subsequently amended her alleged onset of disability date to January 15, 2010.  (R. at 105; doc. 19 at 5.)  Her application was initially denied and upon reconsideration.  (R. at 119-20.)  Plaintiff requested a hearing before an Administrative Law Judge (ALJ).  (R. at 155-57.)  At her request, the ALJ reset the hearing five times between June 21, 2011 and March 20, 2012, so that she could obtain representation and provide her attorney additional time to prepare.[2]  (R. at 37-73.)  Plaintiff appeared and testified at a hearing on June 6, 2012.  (R. at 74-98.)  The ALJ issued a decision finding her not disabled on July 2, 2012.  (R. at 121-37.)  Plaintiff requested review of the ALJ's decision, and on May 17, 2013, the Appeals Council remanded the case to the ALJ.  (R. at 138-41.)

After remand by the Appeals Council, Plaintiff appeared and testified at another hearing before the same ALJ on November 6, 2013.  (R. at 99-118.)  On December 10, 2013, the ALJ issued his decision finding her not disabled.  (R. at 14-36.)  Plaintiff requested review of the ALJ's decision, and the Appeals Council denied her request on June 22, 2015.  (R. at 14-36.)  She timely appealed the Commissioner's decision under 42 U.S.C. § 405(g).

**B.**     **Factual History**

**1.**     ***Age, Work Experience, & Education***

Plaintiff was born on March 19, 1963, and was 50 years old at the time of the second hearing on November 6, 2013 before the ALJ.  (R. at 27, 105.)  She earned a high school GED, and was able to communicate in English.  (R. at 27, 106.)  She had no past relevant work.  (R. at 27.)

**2.**     ***Medical, Psychological and Psychiatric Evidence***

On May 25, 2010, Plaintiff was admitted to Bluitt Flowers Health Center (Bluitt Flowers), a clinic of the Parkland Health & Hospital System, for cough, anxiety, and insomnia.  (R. at 762-63.)

---

[2]  At the request of Plaintiff, the ALJ reset the hearings on June 21, 2011, July 11, 2011, September 2, 2011, October 19, 2011, and March 20, 2012.  (R. at 14-73.)

She was examined by Edith A. Hawkins-Frost, PA-C, and Shenequa N. Steame, L.V.N., and diagnosed with hypertension, chronic sinusitis, and anxiety.  (R. at 768.)  Plaintiff was prescribed Effexor and Trazodone.  (R. at 766, 768.)  She returned to Bluitt Flowers for refills.  (R. at 650.)

On January 27, 2011, Plaintiff reported fatigue, depression, and insomnia without benefit from Effexor.  (R. at 662.)  Ms. Hawkins-Frost and Nurse Steame assessed Plaintiff with hypertension and depression; they recommended she discontinue Effexor, start Wellbutrin, increase Trazodone, and return in two months.  (R. at 619.)

On August 27, 2010, Plaintiff had a clinical interview with status exam for disability with Peter C. Holm, M.D.  (R. at 583-85.)  She complained of major depression and anxiety disorder, which allegedly began after her father's death in 2007.  (R. at 584.)  She struggled with depressed mood, insomnia, diminished appetite, limited energy, isolation, and problems concentrating on instructions.  (*Id.*)  The symptoms were not controlled with Effexor or Trazodone.  (*Id.*)  Examination revealed moderately diminished eye contact and psychomotor activity with a depressed mood and moderately blunted affect, but her thinking was logical and coherent, and her memory and recall were intact.  (*Id.*)  Dr. Holm noted that Plaintiff preferred to stay at home and that any stress increased her depression.  (R. at 585.)  Dr. Holm diagnosed her with recurrent, severe major depression with continuing struggle with depressed mood, insomnia, diminished appetite, limited energy, isolation, and attention/concentration problems, as well as cocaine abuse in remission.  (*Id.*)  Dr. Holm assigned a global assessment of functioning (GAF) score of fifty, noting that Plaintiff "continue[d] to struggle with depressed mood and anxiety."  (*Id.*)

On September 29, 2010, non-examining state agency medical consultant Susan Thompson, M.D., completed a Psychiatric Review Technique questionnaire in which she reported that Plaintiff

had no limitations in activities of daily living, mild limitation in maintaining concentration, persistence, or pace, and a "moderate" limitation in maintaining social functioning. (R. at 587, 597.) She reported that Plaintiff had one or two episodes of decompensation, each of extended duration. (R. at 597.) Dr. Thompson also completed a mental RFC assessment. (R. at 601-03.) She opined that Plaintiff could "understand, remember, and carry out detailed but not complex instructions, make decisions, attend and concentrate for extended periods, accept instructions, and respond appropriately to changes in routine work setting." (R. at 603.) These conclusions were affirmed by non-examining consultants Veena Ghai, M.D., on November 2, 2010, and John Durfor, M.D., on November 11, 2010. (R. at 605-07.)

Plaintiff continued receiving mental health care from Bluitt Flowers, and on February 16, 2011, she was screened for depression, anxiety, and substance abuse by Tamara Johnson, M.S.S.W., L.B.S.W, a social worker. (R. at 678, 680.) Ms. Johnson's examination revealed severe depression and moderate anxiety. (R. at 680.) Plaintiff reported enduring anxiety and insomnia despite taking Bupropion and Trazodone. (R. at 688.) Although she reported improvement on April 8, 2011, Plaintiff again endorsed anxiety, lack of energy, and difficulty sleeping without improvement from Zoloft and Trazodone on August 24, 2011. (R. at 708, 715.) Review of her symptoms was positive for malaise, nausea, depression, and anxiety. (R. at 716.) Although her cognition and memory appeared normal, her affect was blunt. (R. at 717.) Plaintiff was assessed with anxiety "not improved with Effexor, Wellbutri[n], nor Zoloft 50 mg and Trazodone 100mg" and instructed to increase her medications and seek additional mental health treatment. (R. at 623, 717.)

On September 26, 2011, after a referral from Bluitt Flowers, Plaintiff presented to Dallas Metrocare Services (Metrocare) for a psychiatric diagnostic interview exam by Ori S. Ogebe, M.D.,

a psychiatrist.  (R. at 630, 634.)  Dr. Ogebe noted "high" employment problems and complaints with concentration, lack of energy, and withdrawal.  (R. at 630-31.)  Plaintiff reported suicidal ideation and hallucinations and little benefit from her medication.  (R. at 631.)  Upon examination, she was alert and oriented X 3, her memory was intact, and her insight and judgment were fair.  (R. at 632.)  Plaintiff was directed to increase her dosage of Zoloft and return in four weeks.  (*Id.*)

On November 2, 2011, Plaintiff returned to Metrocare on October 3, 2011, and met with Dorothy J. Canady, RN. (R. at 637-38.)  Nurse Canady reported that Plaintiff was alert and oriented, and that her medication was working well.  (R. at 637.)

On November 2, 2011, Plaintiff returned to Metrocare and met with Dr. Ogebe.  (R. at 639-41.)  She described auditory and visual hallucinations, including seeing rats and hearing "things," and reported that she confined herself to the home.  (R. at 639.)  Her symptoms also included "pulling on skin," lack of energy, withdrawal from others, sadness and crying, poor appetite, anxiety, and insomnia.  (*Id.*)  Dr. Ogebe noted that Plaintiff was "less depressed," and that she was alert and oriented X 4.  (R. at 640.)  Dr. Ogebe noted a partial medication response, assigned a "QIDS" score of fourteen, and rated Plaintiff's symptoms as an eight out of ten in severity.  (R. at 639.)  He noted that Plaintiff was "still symptomatic" with hallucinations and prescribed Risperdal. (R. at 640.)

On January 3, 2012, Plaintiff returned to Metrocare, where she was diagnosed with severe, recurrent major depressive disorder with psychotic features and assigned a GAF score of 49 by Tameika Morris, A.P.N.  (R. at 626-27.)  She was noted to have become withdrawn, and her employability was considered unlikely without support.  (R. at 626.)  Medication response was considered "partial," and her symptom severity was again rated as an eight on a ten-point scale.  (R.

at 643.)  Plaintiff reported having little motivation and staying home all day, and while her attention was normal, her insight was considered "poor."  (R. at 643-44.)  Plaintiff was instructed to discontinue Risperdal and return in eight weeks.  (R. at 645.)

Plaintiff returned to Metrocare on February 28, 2012, and met with Nurse Morris.  (R. at 794-96.)  She reported a happy mood and indicated she had recently visited her older brother and attended church.  (R. at 795.)

On March 5, 2012, Sioe Tan, M.D., and Tameika Morris completed a medical assessment of abilities to do work-related activities (mental) for Plaintiff.[3]  (R. at 787-89.)  According to her answers, she substantially lacked the ability to demonstrate reliability through maintaining regular attendance, maintaining concentration for extended two-hour periods, or performing at a consistent pace without an unreasonable number and length of rest periods.  (R. at 787.)  She was substantially limited in accepting instructions and responding appropriately to criticism from supervisors, responding appropriately to changes in a routine work setting, coping with normal work stress, and completing a normal work week without interruptions from psychologically based symptoms. (R. at 788.)  Plaintiff was diagnosed with severe, recurrent major depressive disorder with psychotic features and a GAF score of 49.  (*Id.*)  She was also expected to be absent from a workplace more than four days each month due to her impairments, symptoms, or treatment.  (R. at 789.)

On April 24, 2012, Plaintiff returned to Metrocare and reported a "crawling" sensation on her skin and headaches to Nurse Morris.  (R. at 799-801.)  Nurse Morris noted that Plaintiff's medication response was considered "partial," and her symptom severity was rated as an eight.  (R. at 799.)  Nurse Morris also issued a QIDS score of nine and diagnosed Plaintiff with severe,

---

[3]   Although Dr. Tan signed the medical assessment, Nurse Morris was listed as the service provider on the form.  (R. at 787-89.)

recurrent major depressive disorder and a GAF score of 49.  (R. at 792.)  Employment was considered unlikely without additional support.  (*Id.*)

Plaintiff returned to Metrocare on June 19, 2012, and met with Nurse Morris.  (R. at 852-54.) She again reported the feeling of something "crawling" on her skin, but only at night while in bed, and headaches.  (R. at 853.)  Nurse Morris reported a symptom severity of eight, although her QIDS score remained nine, and that noted that Plaintiff's medication response was considered "partial." (R. at 852-53.)

On August 14, 2012, Plaintiff met with Nurse Morris at Metrocare.  (R. at 858-61.)  She reported an increase in her depression, lack of motivation, and difficulty sleeping.  (R. at 859.) Nurse Morris noted a tearful affect and assigned a QIDS score of thirteen, while Plaintiff's symptom severity was rated as an eight.  (R. at 858-59.)

Plaintiff returned to Metrocare on October 9, 2012, and met with again with Nurse Morris. (R. at 862-65.)  She reported increased anxiety, and her affect was again reported as tearful. (R. at 862-63.)  Plaintiff was prescribed Buspar and encouraged to continue her medications.  (R. at 863.)

Plaintiff again met with Nurse Morris at Metrocare on December 12, 2012.  (R. at 866-67.) She reported a depressed mood and a number of stressors related to her indigence and lack of stable housing.  (R. at 867.)  Her affect was tearful and her insight and judgment were poor, but she was alert and fully oriented.  (R. at 866.)  Nurse Morris encouraged her to continue her medications.  (R. at 867.)

On February 6, 2013, Plaintiff returned to Metrocare for a routine follow-up appointment with Nurse Morris.  (R. at 869-70.)  She was tearful, but fully oriented and had fair insight and judgment.  (R. at 870-71.)  Her medication response was considered "partial," and Plaintiff was

assigned a QIDS score and symptom severity score of eight.  (R. at 869.)  Nurse Morris increased her dosage of Wellbutrin and advised her to continue her medications.  (R. at 871.)

Plaintiff met with Andrelette Dotson, M.S., at Metrocare on February 8, 2013, regarding ways to cope with her feelings of depression and services available to her.  (R. at 877-79.)

Plaintiff returned to Metrocare and met with Nurse Morris on April 9, 2013.  (R. at 881-83.) She had a tearful affect and a partial medication response.  (R. at 881.)  Nurse Morris also reported that other than continued problems sleeping, Plaintiff "reports doing well."  (R. at 882.)

On May 20, 2013, Plaintiff arrived at Metrocare without an appointment because she missed her last appointment and needed a refill.  (R. at 888-89.)  According to Nurse Canady's notes, Plaintiff was alert and oriented.  (R. at 888.)  She reported that she was sleeping well and had a good appetite, and that her medications worked well.  (*Id.*)

Plaintiff returned to Metrocare on June 24, 2013, and met with Nurse Morris.  (R. at 891-92.) Her medication response was considered partial and she was tearful, but she was alert, fully oriented, and had fair judgment and insight.  (R. at 891.)  Nurse Morris noted a depressed mood, but Plaintiff denied both suicidal and homicidal thoughts.  (R. at 892.)  Nurse Morris also completed a treatment plan, which diagnosed Plaintiff with recurrent, severe major depressive disorder with psychotic features and a GAF score of 49.  (R. at 850-51.)  Nurse Morris also noted that employment was considered unlikely without support.  (R. at 850.)

Plaintiff returned to Metrocare on July 25, 2013 for a follow-up appointment with Nurse Morris and medication refills.  (R. at 898.)  She reported medication side effects and was instructed to discontinue Doxepin but continue taking her remaining medications.  (R. at 898-900.)

Plaintiff returned on October 8, 2013 for a routine follow-up appointment with Nurse Morris

at Metrocare and to restart medication.  (R. at 918.)  She noted that she had been without medication

for six weeks, but reported that medications were helpful when taken.  (R. at 920.)

Ambrose C. Nwansi, M.A., a qualified mental health professional at Metrocare, completed

a treatment plan for Plaintiff on October 8, 2013.  (R. at 909, 951.)  According to his assessment:

> [Plaintiff] is depressed and suffers anxiety attacks all the time, [she] can't sleep
> because she is worried about where to sleep and stay next. She has no certain
> dwelling place. [Plaintiff] has no money, no permanent residence. [She] stopped
> abusing alcohol and crack cocaine five years ago. [She] reports no known medical
> problem.

(R. at 909.)  Mr. Nwansi assigned a GAF score of 48 and diagnosed Plaintiff with recurrent, severe

major depressive disorder with psychotic features.  (*Id.*)  In his initial assessment, Mr. Nwansi also

indicated that Plaintiff had become homeless and was unable to find or keep a job.  (R. at 913, 917.)

He assigned a QIDS score of 22 and noted she had "severe/dangerous problems" associated with

psychosis and depression.  (R. at 913-14.)

On October 24, 2013, Plaintiff returned to Metrocare and met with Tammie R. Ankrum, R.N.

(R. at 956.)  She requested a physical and reported to Nurse Ankrum general malaise, achiness that

was reported as a pain of two out of ten, and yellow nasal drainage.  (*Id.*)

On October 25, 2013, Barbara J. Felkins, M.D., an impartial medical expert, completed a

medical source statement of ability to do work-related activities (mental).  (R. at 942-44.)  Dr.

Felkins noted that Plaintiff's ability to understand, remember, and carry out complex instruction and

the ability to make judgments on complex work-related decisions was markedly limited.  (R. at 942.)

She did not identify any limitations regarding Plaintiff's ability to understand, remember, or carry

out simple instructions or related to her ability to make judgments on simple work-related decisions.

(*Id.*)  She also identified moderate limitations regarding Plaintiff's ability to interact appropriately

with the public, supervisors, and co-workers, and to respond appropriately to usual work stations and changes in a routine work setting.  (R. at 943.)  In response to medical interrogatories, Dr. Felkins opined that Plaintiff had no restrictions of activities of daily living, and only moderate difficulty in maintaining social functioning and difficulties in maintaining concentration.  (R. at 946.)

On November 7, 2013, Nurse Morris and Zareena Raffi, M.D., of Metrocare completed a medical assessment of ability to do work-related activities (mental).  (R. at 969-71.)  According to the report, Plaintiff had an extreme loss of the ability to maintain attention for extended two hour periods or perform at a consistent pace without an unreasonable degree of rest periods.  (R. at 969.)  She was likewise considered extremely limited in responding appropriately to supervisor criticism, behaving in an emotionally stable manner, or coping with normal work stress.  (R. at 970.) Plaintiff was assigned a GAF score of 48 and expected to be absent from a workplace four or more days each month due to her condition, symptoms, or treatment.  (R. at 970-71.)

### 3.   *Hearing Testimony*

On November 6, 2013 Plaintiff and a vocational expert (VE) testified at a hearing before the ALJ.[4]  (R. at 99-118.)  Plaintiff was represented by an attorney.  (R. at 101.)

### a.   *Plaintiff's Testimony*

Plaintiff testified that she was 50 years old, five feet and six inches tall, right handed, and weighed approximately 290 pounds.  (R. at 105-07.)  She was single, did not have a valid driver's license, and was homeless at the time of the hearing.  (R. at 107.)

---

[4]  At the hearing, the ALJ noted that the Appeals Council remanded his earlier decision and stated that "We're going to look at this from the very beginning . . . . In other words, basically, we're setting aside the decision that was made [previously], and we'll start from scratch again."  (R. at 103.)

Plaintiff testified that she was unemployed.[5]  (R. at 108.)  She received some unemployment benefits in 2010, but had not received any since then.  (*Id*.)  She had a history of a alcohol, marijuana, and crack cocaine abuse, but she had not used for five years.  (R. at 108.)  Plaintiff smoked cigarettes daily, but she was limited in the amount because she could not afford them.  (R. at 109.)  Because she was homeless, she spent her days preoccupied with where she would sleep at night.[6]  (R. at 23, 112.)  She was able to do her own grocery shopping, but preferred to go in the early morning so she was not around other people.  (R. at 113.)

Plaintiff took medication for her anxiety and depression, and it "sometimes" made her feel "okay," but she still had anxiety and depression at times.  (R. at 109.)  She also had shortness of breath, which she seemed to attribute in part to her medication, and she got winded.  (R. at 109-10.)  When she experienced shortness of breath, she would lay down.  (R. at 109.)  She was unable to walk a city block.  (R. at 112.)  She also could not stand for a long period of time before sitting down.  (*Id.*)  She could lift and carry a gallon of milk.  (*Id.*)

Plaintiff took water pills to help with fluid in her left knee, and the swelling in her leg sometimes went down.  (R. at 110-11.)  As a side effect, however, she was "constantly" going to the restroom.  (*Id.*)  Plaintiff testified that she had most of her symptoms when she had to go out, and she experienced the least amount of symptoms at her doctor's office.  (R. at 113.)

### b.    VE's Testimony

The ALJ asked the VE to consider a hypothetical person who was 50 years old with a limited

---

[5]  At the hearing on June 6, 2012, the ALJ made the finding that Plaintiff had no past relevant work.  (R. at 80.)  At the hearing on November 6, 2013, he questioned her about her work history from the last hearing forward.  (R. at 108.)

[6]  Part of this testimony was identified as "inaudible" on the transcript, but the ALJ appears to address it in his decision, and Plaintiff does not seem to disagree with his characterization of her testimony regarding how she spent her days while homeless.  (R. at 23, 112.)

education and no past relevant work experience.  (R. at 114.)  The hypothetical person could perform all exertional levels, but due to psychologically-based factors, had some limitations.  (R. at 115.)  The hypothetical person could understand, remember, and carry our detailed, but not complex, instructions and make decision.  (*Id*.)  The hypothetical person could concentrate for extended periods and accept instructions, but her contact with co-workers should be occasional and incident to performed work.  (*Id*.)  The hypothetical person could have no public contact.  (*Id*.)  She was able to respond to changes in the workplace.  (*Id*.)

The ALJ asked the VE whether there were jobs that the hypothetical person could perform in the local and national economy.  (*Id*.)  The VE opined the hypothetical person could be a house worker (301.687-010, medium, unskilled, SVP 2), with 10,500 jobs in Texas and 122,600 jobs nationally.  (*Id*.)

The ALJ asked the VE to add to the original hypothetical a medium exertional level limitation.  (*Id*.)  Additionally, the hypothetical person could understand, remember, and carry out only simple instructions, make simple decisions, concentrate for long enough to complete simple tasks, and accept instructions.  (*Id*.)  The hypothetical person's contact with co-workers should be occasional and incidental to the work performed, and she should have no public contact.  (*Id*.)  The hypothetical person could respond to change in the workplace.  (*Id*.)  The VE opined that the hypothetical person could still be a houseworker.  (R. at 115-16.)

The ALJ asked the VE to consider the original hypothetical and the same psychological limitations, but to add a light exertional level limitation.  (R. at 116.)  The VE opined that the hypothetical person could be a marker (209.587-034, light, unskilled, SVP 2), with 3,200 jobs in Texas and 42,600 jobs nationally, or a laundry worker (302.685-010, light, unskilled, SVP 2), with

3,400 jobs in Texas and 58,000 jobs nationally.  (*Id.*)

The ALJ then asked the VE to add to the last hypothetical that concentration and persistence would be limited to 30 minutes at a time and then would require a 10 minute break.  (*Id.*)  The VE responded that there would be no jobs that the hypothetical person could perform with the additional limitations.  (*Id.*)

The VE testified that his testimony was consistent with the Dictionary of Occupational Titles (DOT), but that the DOT does not go into the type and extent of contact with others or into missed time.  (R. at 117.)  His testimony in those areas was based on his experience.  (*Id.*)

In response to questions by Plaintiff's attorney, the VE testified that employers usually tolerate an absence of one day per month, or twelve days per year.  (*Id.*)  He further testified that employers usually put someone on probation, or reprimand or dismiss someone who misses more than once a month, depending on the employer.  (*Id.*)  That process can range between 30 and 90 days.  (*Id.*)  Additionally, employers tolerate approximately five minutes per hour of off-task behavior, including standing up and stretching or restroom breaks, but ten minutes per hour would preclude employment.  (R. at 117-18.)

## C.      ALJ's Findings

The ALJ issued his decision denying benefits on December 10, 2013.  (R. at 17-29.)  At step one,[7] he found that Plaintiff had not engaged in substantial gainful activity since July 19, 2010, the application date.  (R. at 20.)  At step two, he found that Plaintiff had the following severe impairments: anxiety, hypertension, and obesity.  (*Id.*)  Despite those impairments, at step three, he found that Plaintiff had no impairment or combination of impairments that met or equaled the

---

[7]   A five-step analysis is used to determine whether a claimant is disabled under the Social Security Act, which is described more fully below.

severity of one of the impairments listed in the social security regulations.  (R. at 21.)

Next, the ALJ determined that Plaintiff had the following RFC: she could perform medium work, lift and carry 50 pounds occasionally and 25 pounds frequently, stand and walk 6 hours in an 8-hour workday, and sit 6 hours in an 8-hour workday.  (R. at 22.)  Additionally, she could understand, remember, and carry out only simple instructions, make simple decisions, and attend and concentrate for long enough to complete simple tasks and accept instructions.  (*Id.*)  Contact with co-workers should be occasional and incidental to work performed, with no public contact, though Plaintiff could respond appropriately to changes in routine work setting.  (*Id.*)

At step four, the ALJ found that Plaintiff had no past relevant work.  (R. at 27.)  At step five, he found that transferability of job skills was not an issue because Plaintiff did not have any past relevant work, but considering her age, education, work experience, and RFC, there were jobs that existed in significant numbers in the national economy that Plaintiff could perform.  (R. at 28.)  Accordingly, the ALJ determined that Plaintiff had not been under a disability, as defined by the Social Security Act, since July 19, 2010, the date the application was filed.  (R. at 29.)

## II.   ANALYSIS

### A.   Legal Standards

#### 1.   Standard of Review

Judicial review of the Commissioner's denial of benefits is limited to whether the Commissioner's position is supported by substantial evidence and whether the Commissioner applied proper legal standards in evaluating the evidence.  *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994); 42 U.S.C. § 405(g).  "Substantial evidence is that which is relevant and sufficient for a reasonable mind to accept as adequate to support a conclusion; it must be more than a scintilla,

but it need not be a preponderance." *Leggett v. Chater*, 67 F.3d 558, 564 (5th Cir. 1995) (quoting *Anthony v. Sullivan*, 954 F.2d 289, 295 (5th Cir. 1992)).   In applying the substantial evidence standard, the reviewing court does not reweigh the evidence, retry the issues, or substitute its own judgment, but rather, scrutinizes the record to determine whether substantial evidence is present. *Greenspan*, 38 F.3d at 236.  A finding of no substantial evidence is appropriate only if there is a conspicuous absence of credible evidentiary choices or contrary medical findings to support the Commissioner's decision.  *Johnson v. Bowen*, 864 F.2d 340, 343-44 (5th Cir. 1988).

The scope of judicial review of a decision under the supplemental security income program is identical to that of a decision under the social security disability program.  *Davis v. Heckler*, 759 F.2d 432, 435 n. 1 (5th Cir. 1985).  Moreover, the relevant law and regulations governing the determination of disability under a claim for disability insurance benefits are identical to those governing the determination under a claim for supplemental security income.  *Id.* Thus, the Court may rely on decisions in both areas without distinction in reviewing an ALJ's decision.  *Id.* at 436 and n.1.

## 2.      Disability Determination

To be entitled to social security benefits, a claimant must prove that he or she is disabled as defined by the Social Security Act.  *Leggett*, 67 F.3d at 563-64.  The definition of disability under the Social Security Act is "the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  When a claimant's insured status has expired, the claimant "must not only prove" disability, but that the disability existed "prior to the expiration of [his or] her insured status."

15

*Anthony*, 954 F.2d at 295.  An "impairment which had its onset or became disabling after the special earnings test was last met cannot serve as the basis for a finding of disability."  *Owens v. Heckler*, 770 F.2d 1276, 1280 (5th Cir. 1985).

The Commissioner utilizes a sequential five-step analysis to determine whether a claimant is disabled:

1.   An individual who is working and engaging in substantial gainful activity will not be found disabled regardless of medical findings.

2.   An individual who does not have a "severe impairment" will not be found to be disabled.

3.   An individual who "meets or equals a listed impairment in Appendix 1" of the regulations will be considered disabled without consideration of vocational factors.

4.   If an individual is capable of performing the work he has done in the past, a finding of "not disabled" must be made.

5.   If an individual's impairment precludes him from performing his past work, other factors including age, education, past work experience, and residual functional capacity must be considered to determine if work can be performed.

*Wren v. Sullivan*, 925 F.2d 123, 125 (5th Cir. 1991) (summarizing 20 C.F.R. § 404.1520(b)-(f) (currently 20 C.F.R. § 404.1520(a)(4)(i)-(v) (2012)).  Under the first four steps of the analysis, the burden lies with the claimant to prove disability.  *Leggett*, 67 F.3d at 564.  The analysis terminates if the Commissioner determines at any point during the first four steps that the claimant is disabled or is not disabled.  *Id.*  Once the claimant satisfies his or her burden under the first four steps, the burden shifts to the Commissioner at step five to show that there is other gainful employment available in the national economy that the claimant is capable of performing.  *Greenspan*, 38 F.3d at 236.  This burden may be satisfied either by reference to the Medical-Vocational Guidelines of the regulations or by expert vocational testimony or other similar evidence.  *Fraga v. Bowen*, 810

F.2d 1296, 1304 (5th Cir. 1987).  After the Commissioner fulfills this burden, the burden shifts back

to the claimant to show that he cannot perform the alternate work.  *Perez v. Barnhart*, 415 F.3d 457,

461 (5th Cir. 2005).  "A finding that a claimant is disabled or is not disabled at any point in the five-

step review is conclusive and terminates the analysis."  *Loveland v. Bowen*, 813 F.2d 55, 58 (5th Cir.

1987).

**B.**     **Issue for Review**

Plaintiff raises two issues for review:

1.     The ALJ's implicit rejection of the treating source opinions is contrary to law
       and is not supported by substantial evidence.

2.     The ALJ failed to make a specific finding regarding [Plaintiff's] ability to
       sustain employment despite her recurrent, severe major depressive disorder.

(doc. 19 at 17, 23.)[8]

**C.**     **Medical Opinion**

Plaintiff contends that the ALJ's implicit rejection of her primary treating source's opinions

in determining her RFC is contrary to law and is not supported by substantial evidence.  (doc. 19 at

17.)  She argues that the ALJ's "unfavorable determination rests in large part on the implicit

rejection of two opinions provided by [Plaintiff's] primary treating source, Dallas Metrocare, which

identified disabling work-related limitations that the ALJ essentially rejected."  (*Id.*)

*1.     Residual Functional Capacity*

Residual functional capacity, or RFC, is defined as the most that a person can still do despite

recognized limitations.  20 C.F.R. § 404.1545(a)(1) (2003).  The RFC determination is a combined

"medical assessment of an applicant's impairments with descriptions by physicians, the applicant,

---

[8]  Plaintiff identifies these issues in a longer form in the issues presented section of her brief than she uses later in the
analysis section of her brief.  (*See* doc. 19 at 4, 17, 23.)

or others of any limitations on the applicant's ability to work." *Hollis v. Bowen*, 837 F.2d 1378, 1386-87 (5th Cir. 1988) (per curiam).   The relevant policy interpretation regarding the RFC determination states:

> 1. Ordinarily, RFC is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis. A "regular and continuing basis" means 8 hours a day, for 5 days a week, or an equivalent work schedule.
>
> 2. The RFC assessment considers only functional limitations and restrictions that result from an individual's medically determinable impairment or combination of impairments, including the impact of any related symptoms. . . .

SSR 96–8p, 1996 WL 374184, at *1 (S.S.A. July 2, 1996).   The ALJ "is responsible for assessing the medical evidence and determining the claimant's residual functional capacity."   *Perez v. Heckler*, 777 F.2d 298, 302 (5th Cir. 1985).

Determination of an individual's RFC should be based on all of the relevant evidence in the case record, including opinions submitted by treating physicians or other acceptable medical sources.   20 C.F.R. § 404.1545(a)(3) (2012); SSR 96-8p, 1996 WL 374184, at *1.   Every medical opinion is evaluated regardless of its source, but the Commissioner generally gives greater weight to opinions from a treating source.   20 C.F.R. § 404.1527(c)(2).   A treating source is a claimant's "physician, psychologist, or other acceptable medical source" who provides or has provided a claimant with medical treatment or evaluation, and who has or has had an ongoing treatment relationship with the claimant.   *Id.* § 404.1502.   When "a treating source's opinion on the issue(s) of the nature and severity of [a claimant's] impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence," the Commissioner must give such an opinion controlling weight.   *Id.* § 404.1527(c)(2).

If controlling weight is not given to a treating source's opinion, the Commissioner considers

six factors in deciding the weight given to each medical opinion: (1) whether the source examined the claimant or not; (2) whether the source treated the claimant; (3) the medical signs and laboratory findings that support the given opinion; (4) the consistency of the opinion with the record as a whole; (5) whether the opinion is made by a specialist or non-specialist; and (6) any other factor which "tend[s] to support or contradict the opinion." *See id.* § 404.1527(c)(1)–(6). The "standard of deference to the examining physician is contingent upon the physician's ordinarily greater familiarity with the claimant's injuries. . . . [W]here the examining physician is not the claimant's treating physician and where the physician examined the claimant only once, the level of deference afforded his opinion may fall correspondingly." *Rodriguez v. Shalala*, 35 F.3d 560, 1994 WL 499764, at *2 (5th Cir. 1994) (unpublished) (citing *Moore v. Sullivan*, 919 F.2d 901, 905 (5th Cir. 1990)). A treating physician's opinion may also be given little or no weight when good cause exists, such as "where the treating physician's evidence is conclusory, is unsupported by medically acceptable clinical, laboratory, or diagnostic techniques, or is otherwise unsupported by the evidence." *Newton v. Apfel*, 209 F.3d 448, 456 (5th Cir. 2000). If the evidence supports a contrary conclusion, an opinion of any physician may be rejected. *Id.* at 455; *Bradley v. Bowen*, 809 F.2d 1054, 1057 (5th Cir. 1981) (per curiam).

A factor-by-factor analysis is unnecessary when "there is competing first-hand medical evidence and the ALJ finds as a factual matter that one doctor's opinion is more well-founded than another," or when the ALJ has weighed "the treating physician's opinion on disability against the medical opinion of other physicians who have treated or examined the claimant and have specific medical bases for a contrary opinion." *Newton*, 209 F.3d at 458. "[A]bsent reliable medical evidence from a treating or examining physician *controverting the claimant's treating specialist,*

19

an ALJ may reject the opinion of the treating physician only if the ALJ performs a detailed analysis of the treating physician's views under the criteria set forth in [20 C.F.R. § 404.1527(c)]." *Id.* at 453 (emphasis added).

While an ALJ should afford considerable weight to opinions and diagnoses of treating physicians when determining disability, sole responsibility for this determination rests with the ALJ. *Newton*, 209 F.3d at 455. The ALJ's RFC decision can be supported by substantial evidence even if he does not specifically discuss all the evidence that supports his decision, or all the evidence that he rejected. *Falco v. Shalala*, 27 F.3d 160, 164 (5th Cir. 1994). A reviewing court must defer to the ALJ's decision when substantial evidence supports it, even if the court would reach a different conclusion based on the evidence in the record. *Leggett*, 67 F.3d at 564. Nevertheless, the substantial evidence review is not an uncritical "rubber stamp" and requires "more than a search for evidence supporting the [Commissioner's] findings." *Martin v. Heckler*, 748 F.2d 1027, 1031 (5th Cir. 1984) (citations omitted). The court "must scrutinize the record and take into account whatever fairly detracts from the substantiality of the evidence supporting the [ALJ's] findings." *Id.* (citations omitted) Courts may not re-weigh the evidence or substitute their judgment for that of the Commissioner, however, and a "no substantial evidence" finding is appropriate only if there is a conspicuous absence of credible evidentiary choices or contrary medical findings to support the ALJ's decision. *See Johnson*, 864 F.2d at 343 (citations omitted).

Here, before proceeding to step four, the ALJ determined that Plaintiff had the RFC to perform medium work, lift and carry 50 pounds occasionally and 25 pounds frequently, stand and walk 6 hours in an 8-hour workday, and sit 6 hours in an 8-hour workday. (R. at 22.) Additionally, Plaintiff could understand, remember, and carry out only simple instructions, make simple decisions,

and attend and concentrate for long enough to complete simple tasks and accept instructions.  (*Id.*)

Contact with co-workers should be occasional and incidental to work performed, with no public

contact, though Plaintiff could respond appropriately to changes in routine work setting.  (*Id.*)  The

ALJ's analysis seems to consider the medical opinions of Nurse Morris and Drs. Raffi and Tan

separately when weighing the medical evidence and determining the RFC.  (*See* R. at 22-27.)

### 2.      *Primary Treating Source*

Plaintiff argues that Metrocare is the primary treating source and that the "medical opinions

in this case were jointly completed by Metrocare social worker Tameika Morris and Metrocare

physicians Zareena Raffi, M.D. and Sioe Tan., M.D." (doc. 19 at 18.)  According to Plaintiff, Nurse

Morris and Drs. Raffi and Tan were "merely proxies for Dallas Metrocare," and "while the

individuals who signed the Metrocare statements themselves may have had limited interaction with

[Plaintiff], the facility where they practiced had provided the patient extensive mental health

treatment."  (*Id.* at 20.)  She argues, "To separate the healthcare providers from the facility they

serve would be to ignore the practical reality that the non-profit provider undoubtedly lacks the

financial resources to provide highly personalized, one-on-one medical care for each and every

patient."  (*Id.*)

Plaintiff relies on *Shontos v. Barnhart*, 328 F.3d 418 (8th Cir. 2003), in which a claimant

received grief counseling from three different individuals at a community mental health center.

*Shontos*, 328 F.3d at 426.  The Eighth Circuit noted that while some of the individuals at the center

were non-acceptable medical sources:

> substantial evidence on the record as a whole reveals that [the plaintiff] sought
> mental health care frequently at Gannon Center between January 1999, and June
> 2000. Ms. Bookmeyer saw her forty-nine times over the course of fifteen months,
> which is more than adequate to provide a longitudinal picture of [the plaintiff's]

impairment. Substantial evidence indicates that the Gannon Center provided a team approach to mental health care. [The plaintiff] was treated by therapists Burn and Bookmeyer. She was evaluated intermittently by Ms. Flaherty for the purpose of prescribing psychiatric medication. In addition, Ms. Shontos was seen twice a week by a social worker from Gannon Center. The opinions offered by Dr. Burn, Ms. Bookmeyer, and Ms. Flaherty reflected clinical judgments of professionals who had interacted with and observed Ms. Shontos over time. *Their opinions and evaluations were based on a longitudinal perspective of Ms. Shontos. The opinions of these three treating mental health care providers were consistent.*

*Id.* (emphasis added).  The court then found that the ALJ did not have adequate reason to discount the opinions of the three mental health care providers, and that "[t]he opinions of these treating sources should have been afforded greater weight than those of the nontreating, nonexamining consultants."  *Id.* at 427.

Unlike *Shontos*, there is no evidence in the record to support Plaintiff's allegation that Metrocare follows a team approach.  The doctors who rendered opinions rarely met with her, and she met with various individuals at Metrocare.  Significantly, the ALJ recognized inconsistencies within the Metrocare treatment records, as discussed more fully below.  (*See* R. at 26.)  Even if it were applicable, *Shontos* is distinguishable from the facts in this case.

Moreover, courts in this district have differentiated between the medical opinions of various doctors at Metrocare when considering the opinions of treating physicians.  *See, e.g. Bookman v. Colvin*, 3:13–CV–4428–B, 2015 WL 614850, at *8 & n.3 (N.D. Tex. Feb. 12, 2015) (noting the inconsistency between the medical records of the treating physician at Metrocare and other Metrocare professionals); *Martinez v. Colvin*, No. 4:12–CV–542–A, 2013 WL 5227060, at *3-5 (N.D. Tex. Sept. 16, 2013) (considering individually a treating physician at Metrocare); *Lee v. Astrue*, No. 3:10–CV–155–BH, 2010 WL 3001904, at *8 & n.6 (N.D. Tex. July 31, 2010) (noting that the opinions of a doctor at Metrocare were based on his examination and role in the plaintiff's

treatment and not the role of other Metrocare doctors in the plaintiff's treatment).  Because other courts within the Northern District of Texas have considered individual professionals at Metrocare as the treating physicians and Plaintiff has not identified any binding contrary authority, the ALJ did not err by considering the opinions of the various mental health professionals at Metrocare individually.

To the extent that any of the doctors from Metrocare were alleged to be Plaintiff's treating physician, the ALJ found that the medical opinions of Nurse Morris, Dr. Tan, and Dr. Raffi could not be given controlling weight in determining the RFC because their opinions were inconsistent with other substantial evidence in the record.  *Smith*, 2014 WL 4467880, at \*3.   In considering Plaintiff's RFC, the ALJ considered the entire record, including physical examinations and diagnostic findings, in reaching his determination.  (R. at 22-27.)  Also, the ALJ considered in detail the opinions of individual doctors and medical professionals from Metrocare.  (*See* R. at 22-27.)  After considering their opinions and the entire medical record, the ALJ noted that "[g]iven the lack of consistency among [Plaintiff's] treating records and the opinions rendered by Dr. Tan and [Nurse] Morris, [their] opinion is accorded little weight."  (R. at 26.)  Also, the ALJ gave the opinion of Dr. Raffi and Nurse Morris "little weight because it [was] grossly at odds with Metrocare treating records that reflect good medication response, generally normal mental status, and improved levels of social and mental functioning with medical management of symptoms."  (R. at 26.)   In contrast, the ALJ found that the opinions of Dr. Felkins were "consistent with [Plaintiff's] Metrocare treating records, whereas the opinions of the Metrocare providers [were] not."  (R. at 27.)  "As such, more weight [was] accorded to Dr. Felkins' [sic] opinion, as her notes show[ed] that on review of [Plaintiff's] treating records, she found [Plaintiff's] medications were generally effective, as is

similarly reflected in [Plaintiff's] treating notes."  (*Id.*)

Additionally, the ALJ emphasized the inconsistency in the treatment, medical records, and how Plaintiff presented herself.  (*See* R. at 27) ("The claimant's activities of daily living, as she described them to the treating doctors and to the consultative examiner, do not reflect a mental impairment of disabling severity. The claimant reported that she enjoys babysitting her grandchildren[,] . . . . she does not have difficulty performing personal care tasks[, and] . . . . she does most of the household chores, such as cleaning.").  He also found other substantial evidence supported a contrary medical conclusion to Nurse Morris, Dr. Tan, and Dr. Raffi's medical opinions. *Bradley,* 809 F.2d at 1057.  In making his assessment, the ALJ acknowledged the ongoing treatment relationship with the medical professionals at Metrocare, thereby addressing their examining and treatment relationship with her as well as their knowledge of her physical limitations. *See* 20 C.F.R. § 404.1527(c)(1), (2), (5).  He also considered Drs. Tan and Raffi's lack of direct interaction with Plaintiff during her visits to Metrocare.  (*See* R. at 22-27.)  As noted, the ALJ also relied on Dr. Holm's psychological consultative evaluation and gave more weight to the ME's testimony. (R. at 23-24, 27.)  As the trier of fact, the ALJ was entitled to weigh the evidence against other objective findings, including the opinion evidence available, and the record as a whole.  Substantial evidence properly supports the ALJ's appropriate evaluation of the treating source opinions.  Accordingly, a reviewing court must defer to the ALJ's decisions. *See Leggett*, 67 F.3d at 564.

### 3.     Six-Factor Analysis

Plaintiff also contends that since the ALJ rejected some of the Metrocare medical opinions and failed to incorporate much of their medical opinions in the RFC, the ALJ was required to go through a *Newton* analysis.  (doc. 23 at 7.)  In *Newton*, the ALJ was required to go through the six

factors because he rejected the treating physician's opinion as controlling. *Newton*, 209 F.3d at 456. A factor-by-factor analysis is unnecessary, however, when "there is competing first-hand medical evidence and the ALJ finds as a factual matter that one doctor's opinion is more well-founded than another," or when the ALJ has weighed "the treating physician's opinion on disability against the medical opinion of other physicians who have treated or examined the claimant and have specific medical bases for a contrary opinion." *Id.* at 458.  Because the ALJ relied on competing first-hand medical evidence in this case, including Metrocare's own treatment notes and Plaintiff's testimony, and he found Dr, Holm's and the ME's opinions were more well-founded than the opinions from Metrocare, he was not required to perform a full factor-by-factor analysis. *See id.*  Accordingly, even though the ALJ did not give controlling weight to Nurse Morris, Dr. Tan, and Dr. Raffi's medical opinions, he did not need to go through the *Newton* factors.  *See* 20 C.F.R. § 404.1527(d)(2).

Since the ALJ afforded the appropriate weight to the treating physicians' opinions, remand is not required on this issue.

## D.    <u>Ability to Sustain Employment</u>

Plaintiff argues that the ALJ erred by failing to make specific findings regarding her ability to sustain employment despite her recurrent, severe major depressive disorder.  (doc. 19 at 23.)  She claims that "[g]iven that her recurrent major depressive disorder waxed and waned in its manifestation of disability symptoms, the ALJ was required to issue such a specific finding, and the failure to do so [was] legal error requiring reversal."  (*Id.*)

A finding that a social security claimant is able to engage in substantial gainful activity requires "more than a mere determination that the claimant can find employment and that he can

physically perform certain jobs; it also requires a determination that the claimant can hold whatever job he finds for a significant period of time." *Singletary v. Bowen*, 798 F.2d 818, 822 (5th Cir. 1986); *see also Leidler v. Sullivan*, 885 F.2d 291, 292-93 (5th Cir. 1981).  This requirement extends to cases involving mental as well as physical impairments.  *Watson v. Barnhart*, 288 F.3d 212, 217-218 (5th Cir. 2002).  The requirement is not universal, however.  *Frank v. Barnhart*, 415 F.3d 457, 465 (5th Cir. 2005).  The ALJ is not required in every case to make specific and distinct findings that the claimant can maintain employment over a sustained period.  *Id.*  An RFC determination itself encompasses the necessary finding unless the claimant's ailment, by its nature, "waxes and wanes in its manifestation of disabling symptoms."  *See id.*; *Perez v. Barnhart*, 415 F.3d 457, 465 (5th Cir. 2005).  A specific finding is required if there is "evidence that [the] claimant's ability to maintain employment would be compromised despite his ability to perform employment as an initial matter, or an indication that the ALJ did not appreciate that an ability to perform work on a regular and continuing basis is inherent in the definition of RFC."  *Dunbar v. Barnhart*, 330 F.3d 670, 672 (5th Cir. 2003).  Allegations that an impairment causes good days and bad days do not by themselves require an explicit finding on the ability to maintain employment.  *See Perez*, 415 F.3d at 465.

Here, Plaintiff points to her own testimony that (1) with regards to dizziness and nausea that she has "some days I do real good, but some days I just—I just don't know what it is. I don't know, you know, I don't want to eat," (2) due to depression, her energy level "varies. You know, some days, like I say, some days it's good. Some days it's not," (3) some days she lacks the energy to bathe herself, (4) she rarely went grocery shopping because she experienced "good days and bad days," and (5) she testified that her symptoms were best when she visited her doctors because they

made her feel safe. (doc. 19 at 24-25) (citations omitted). Plaintiff also points to her sporadic work record and the medical opinions from Metrocare professionals. (*Id.* at 25.)

Although the record shows a great deal of evidence that Plaintiff testified that she had good days and bad days and that she had not worked previously, there is no evidence that her symptoms waxed and waned in a manner that precluded employment or that her lack of past relevant work was a result of her symptoms and not the result of some non-medical reason. (*See* doc. 19 at 23-27.) Additionally, the medical records from Metrocare reflect that Plaintiff's medication had at least a "partial" effect. (R. at 639, 643, 799, 852-53, 869, 881, 891.) At other times, Plaintiff reported that she was sleeping well, had a good appetite, that her medications worked well, or that she was doing well. (R. at 109, 637, 795, 882, 888, 920.) The records from Metrocare also reflect that Plaintiff's medication was helpful when taken. (R. at 920.)

Moreover, in determining her RFC, the ALJ considered in detail the various medical opinions from Metrocare and the ME, and the entire record. (R. at 22-27.) He also expressly considered Plaintiff's own testimony about how her impairments allegedly impacted her daily activities and the impact of her medication on her symptoms. (*See* R. at 24, 27) ("The claimant's activities of daily living, as she described them to the treating doctors and to the consultative examiner, do not reflect a mental impairment of disabling severity. The claimant reported that she enjoys babysitting her grandchildren[,] . . . . she does not have difficulty performing personal care tasks[, and] . . . . she does most of the household chores, such as cleaning.").

Accordingly, Plaintiff did not present evidence that her ability to maintain employment was compromised, or the ALJ did not appreciate that the ability to perform work on a regular and continuing basis was inherent in the definition of RFC. Under these circumstances, an express

27

finding by the ALJ was not required, and substantial evidence exists to support the ALJ's decision.

### III. CONCLUSION

The Commissioner's decision is **AFFIRMED**.

**SO ORDERED** on this 22nd day of September, 2016.

IRMA CARRILLO RAMIREZ
UNITED STATES MAGISTRATE JUDGE